WO                                                                                                    **LMH**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Mark Isbell, | No. CV 04-2242-PHX-JAT (VAM) |
| Plaintiff, | **ORDER** |
| vs. | |
| Justin Hughes, et al., | |
| Defendants. | |

Plaintiff William Isbell, a state prisoner, filed this action claiming that his Fourth Amendment rights were violated by a search of his home and by excessive force in his arrest. Currently pending are:

(1) Plaintiff's Motion for Partial Summary Judgment, Defendants' Response and Plaintiff's Amended Reply (Doc. ##39, 42, 85, 100-101);

(2) Defendants' Cross-Motion for Summary Judgment, Plaintiff's Amended Response, and Defendants' Reply (Doc. ##83-84, 94-95,100-101); and

(3) Plaintiff's Motion for Order to Possess and Use Personal Typewriter for Pro-Se Procedures, Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction Hearing, and Defendants' Response (Doc. ##53, 70-71).

The Court will (1) grant in part Plaintiff's summary judgment motion for his claim that Officers Hughes and Gallant illegally entered his home but deny in part as to the City of El Mirage, (2) grant in part Defendants' Cross-Motion for Summary Judgment on the excessive

force claim but deny in part Defendants' contentions regarding the availability of punitive damages, and (3) deny Plaintiff's motions seeking injunctive relief.  The Court's decision leaves for trial the issue of compensatory and punitive damages for the unconstitutional entry and ensuing search.

**I. Procedural History**

Plaintiff sues the City of El Mirage and Officers Hughes, Gallant, Tevault and Chambers, contending that they violated the Fourth Amendment by searching his home without a warrant and without the express consent of his stepson on December 12, 2003, and by using excessive force in Plaintiff's arrest later that day.

Plaintiff moved for partial summary judgment on the search issue against Officers Hughes and Gallant, and the City of El Mirage (Doc. ##39, 42).  He submitted his own declaration in support and attached excerpts of testimony by Officer Hughes from a state court criminal trial, an affidavit of Jodie Isbell, and copies of newspaper articles (Doc. #39). Plaintiff expressly declined to move for summary judgment on his claim of excessive force in arrest (Pl.'s Decl. at 1, Doc. #39).

Defendants responded and cross-moved for summary judgment, contending that:

(1) they are entitled to qualified immunity because:

(a) Plaintiff's minor son impliedly consented to the search, or the officers did not violate a clearly established constitutional right in believing they had consent,

(b) there was no excessive force in the arrest, and the officers did not violate a clearly established constitutional right in pointing their guns;

(2) the City cannot be liable based on respondeat superior, and

(3) Plaintiff cannot be awarded punitive damages.

(Defs.' Resp. & Cross-Motion, Doc. ##83, 85).  In support, they submit a Statement of Facts, along with (1) police reports, (2) deposition excerpts by Plaintiff, his ex-wife Jodie Sue Holmes, and his stepson A.C., and (3) Officer Hughes' affidavit (DSOF, Doc. #84).

Plaintiff submitted an Amended Reply and Response, contending that (1) the City failed to train and supervise its officers, (2) the search lacked consent and was not merely a protective sweep, (3) excessive force was used against him, (4) punitive damages are

- 2 -

1  available, and (5) the qualified immunity defense is not viable (Doc. ##100-101). In support,
2  he filed a Statement of Facts (PSOF, Doc. #101).

3  Defendants filed a Reply in support of their summary judgment motion and a
4  controverting statement of facts (Doc. ##94-95). The parties have also filed an Amended
5  Joint Pretrial Statement (Doc. #105).

## II. Factual Background

On the day of the events at issue, December 12, 2003, Plaintiff lived in El Mirage with his wife, Jodie Isbell (now Jodie Sue Holmes), his 11-year-old stepson A.C., and his son, who was under 2 years old. During the previous year, police had been summoned to the Isbell residence on several occasions, frequently for domestic violence incidents between Plaintiff and Jodie.

On September 22, 2002, Officer Hughes and another officer responded to a call that Jodie Isbell needed protection because Plaintiff threatened her. A background check showed that Plaintiff was a member of the Aryan Brotherhood gang (DSOF ¶¶ 3-4 & Ex. B-2). On October 27, 2002, Officers Hughes was asked to assist with service of an order of protection on Plaintiff. Id. ¶ 6 & Ex. B-4.

On November 13, 2002, Plaintiff was arrested for criminal damage/domestic violence. Officer Hughes reported that Jodie Isbell told him that she had an argument with Plaintiff about getting divorced, and he had backed his Pathfinder, with their nine-month-old son seated in the back, into her empty Taurus in the driveway. When he continued to push the Taurus with his Pathfinder, she told him to stop, and he drove back into the garage (DSOF ¶¶ 8-9 & Ex. B-6).

Plaintiff was arrested for assault/domestic violence on December 11, 2002. An officer who is not a defendant reported that Jodie Isbell said that she had an argument with Plaintiff over financial matters, and he punched her in the chest and drove away (DSOF ¶ 10 & Ex. B-7).

On September 3, 2003, Officer Tevault responded to a call regarding a family fight. Jodie told Tevault that she had an argument with Plaintiff about picking up her son, and she

thought he tried to hit her while driving a large truck (DSOF ¶ 12 & Ex. B-14). The next day, Plaintiff was arrested for aggravated assault. Tevault reported that a high-risk stop had been made because of the nature of the felony and Plaintiff's affiliation with the Aryan Brotherhood. Id. ¶ 13 & Ex. B-15. On October 18, 2003, Plaintiff was served with an order of protection. Id. ¶14 & Ex. B-16.

On November 18, 2003, police were summoned after several neighbors called and reported that Plaintiff had run over Jodie with his car (DSOF ¶ 15 & Ex. B-19). Jodie said that she suffered a fractured pelvic bone. Id. ¶¶16-17, Ex. B-19, & Ex. C – Jodie Sue Homes Dep. at 35, Jan. 19, 2006.[1] She and Plaintiff reportedly argued about Plaintiff's drug use. Id. Ex. B-19 and Holmes Dep. at 36. Plaintiff had left the scene. The narrative report by Officer Hennessy indicated that after Jodie said that Plaintiff was violent and carried weapons, a background check was run and Plaintiff had convictions in the mid-1990s for a weapons charge, aggravated assault with a weapon, and assault. Id. ¶ 31 & Ex. B-19. The officer requested that charges be filed for aggravated assault. Id.

On November 20, 2003, Jodie reported to police that she believed Plaintiff had returned to the home and stolen her checkbook (DSOF, Ex. B-20). On November 21, a person named Brian Beitman reported that his car had been parked at the Isbell home. Jodie's cousin was considering buying the car, and Jodie was holding the keys for Beitman. Plaintiff reportedly took the car and hit Jodie with it. Id. Ex. B-21. Plaintiff also told Beitman that he did not intend to return the car. Id.

On November 26 and 28, 2003, police unsuccessfully attempted to arrest Plaintiff (DSOF ¶¶ 19 & Ex. B-22-24). Defendants claim that Plaintiff was "at large," but Plaintiff asserts that he was living at his home a few days after Thanksgiving "around November 27, 2003" (Am. Reply & Resp. at 6).

---

[1] At Plaintiff's criminal trial arising from the incident in May 2004, the parties stipulated that the incident did not cause the broken pelvis (PSOF Ex. 22).

- 4 -

On December 3, Officer Hughes received a report from Jodie that Beitman's stolen car was in a parking lot at a McDonald's at McDowell and 7th Avenue in Phoenix. The car was recovered (DSOF, Ex. B-22).

The incident that is at issue in this case occurred on December 12, 2003, when Officers Hughes and Gallant went to Plaintiff's home. Plaintiff's 11-year-old stepson A.C. was babysitting his younger brother. The officers entered the home, and the parties dispute whether A.C. impliedly consented to their entry. Notably, there is no dispute that the officers did not expressly ask for permission to enter the home. There is a dispute regarding whether once the officers were inside, they conducted a protective sweep or made a more extensive search described by Plaintiff as "ransacking." It is undisputed that the search did not result in evidence of any illegal activity.

While at the home, Hughes and Gallant learned that Plaintiff was on his way back, and they called back-up officers. Plaintiff stopped his car at a park near his home, and he was arrested at gunpoint for aggravated assault. The other officers involved were Tevault and Chambers. The parties dispute whether the force used during the arrest was excessive. Regardless, Officer Hughes requested that Plaintiff be charged with aggravated assault (domestic violence), unlawful use of means of transportation, and theft (DSOF Ex. B-25).

In the Maricopa County Superior Court Plaintiff was tried for aggravated assault. On May 9, 2004, a jury found him not guilty (Pl.'s Decl. ¶ 8 & Ex. 4, Doc. #39). Plaintiff is nevertheless serving a 22½-year sentence in state prison for other crimes (Pl.'s Dep. at 49).

**III. Summary Judgment Standard**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). When considering a summary judgment motion, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). These inferences are limited, however, "to those

1  upon which a reasonable jury might return a verdict." Triton Energy Corp. v. Square D. Co.,
2  68 F.3d 1216, 1220 (9th Cir. 1995).

3  Rule 56(c) mandates the entry of summary judgment against a party who, after
4  adequate time for discovery, fails to make a showing sufficient to establish the existence of
5  an element essential to that party's case, and on which the party will bear the burden of proof
6  at trial. Celotex, 477 U.S. at 322-23.  In such a situation, there can be no genuine issue of
7  material fact, since a complete failure of proof concerning an essential element of a
8  nonmoving party's case necessarily renders all other facts immaterial. Id.

9  **IV. Search**

10  **A. Evidence**

11  When Officers Hughes and Gallant arrived at Plaintiff's home on December 12, 2003,
12  Plaintiff's 11-year-old son A.C. was home babysitting his younger brother. Plaintiff and his
13  wife were not there. The purpose of their visit is disputed; Defendants claim they were
14  looking for Plaintiff and made only a protective sweep, but Plaintiff claims they were looking
15  for evidence of illegal activity and "ransacked" his home.

16  More than two years after the incident, on December 28, 2005, A.C. testified at his
17  deposition as follows:

18      A.    . . . I saw two cops, so I just opened the door.

19      Q.    And when you opened the door, what did you say?

20      A.    I don't remember.

21      Q.    Okay. Do you remember what they said?

22      A.    Not really. Like, I remember, like they asked me where my dad was, and they asked me to call him and ask him, so I did.

While I was on there, they just sort of kind of walked in. I didn't like, tell them to come in and, like – them, like, after, like, I called my dad, I like, ummm, went over, and I was, like talking to one of the cops. And one of the cops was over there, like, in the kitchen. I don't know what he was doing. And then we, like, talked.

I don't know. I just asked, like, why – well, like, I kind of wanted to know what was going on, so I was asking like, "Well, why are you guys here?"

|   |   |   |
|---|---|---|
| 1 | | This was after I called my dad and asked him. And then I told them, and they were just, like, kind of in the house, and I didn't want to, like, say anything because they are kind of cops. I didn't want to tell them, "Get out now." |
| 2 | | |
| 3 | | |
| 4 | | Then I think they left, like, after that. And then, like, I tried to go, like, tell my dad – because they, like, told me not to tell him the cops were here. So I went over to, like, go call him and at least tell him, like, "Something is, like – cops were just here." |
| 5 | | |
| 6 | | And they, like – because, like, the number was on the caller ID and the caller ID number was missing. |
| 7 | | |
| 8 | | And then they just kind of left. And I remember my mom coming home and she was crying. |
| 9 | | And that's all I know about this, that I remember. You can ask some questions and that might refresh my memory more. |
| 10 | | |
| 11 | Q. | Okay. Tell me this; when the cops were first there, did you have a suspicion that they wanted to arrest your dad? |
| 12 | A. | Yeah. I knew, like – I knew, like, it was something – either my dad or my mom, and I just kind of took a wild guess and said it was something about my dad. |
| 13 | | |
| 14 | Q. | Tell me why your wild guess would lead to – |
| 15 | A. | I don't know. |
| 16 | Q. | – that conclusion. |
| 17 | A. | I have no clue. |
| 18 | Q. | Okay. So you didn't know the reason why they wanted to arrest him, you just thought that the cops were there to arrest your dad? |
| 19 | | |
| 20 | A. | Yeah. That – like, they told me they weren't going to do anything, but I knew that was a lie because they didn't, like, knock on the door to say, "How's it going?" |
| 21 | | |
| 22 | | So I knew, like, something was going on. And that's it. |
| 23 | *Q.* | *Okay. Do you remember anything more about the conversation that you had with the two officers when they were first at your door and you said – they asked if your dad was there and you said no? Did they ask whether or not they could come in and check?* |
| 24 | | |
| 25 | *A.* | *No. They didn't really ask that. They just asked me to call him.* |
| 26 | Q. | Okay. So what you remember is they came to the door, you opened the door, they asked if he was there or not, and then they asked you to call him? |
| 27 | | |
| 28 | A. | Yeah, they asked me to call him and ask him where he was, so I went and did that. |

- 7 -

| | | |
|---|---|---|
|Q.|And did they follow you into the house when you went to call?|
|A.|They, like, probably walked in, like, then, like, when I started dialing the number, I, like, saw them in there, I was just, like, okay, because I didn't want to tell them anything like "Get out" or something.|
|*Q.*|*Did they ask if they could come in?*|
|*A.*|*No, they didn't.*|

(A.C. Deposition on Dec. 28, 2005, at 33-36, DSOF, Ex. E, Doc. #84) (emphasis added).

According to the affidavit of Jodie Isbell, when she arrived home after Plaintiff's arrest, she found A.C. crying and saying that "th[ey] got daddy." A.C. said that the detectives made him call his parents. Jodie Isbell went upstairs and saw that the lights were on and the drawers were open. She returned downstairs and asked A.C. if the detectives had searched the house, and he said yes. She asked him if they had asked to do so, and A.C. said "no." (Pl.'s Decl. – Jodie Isbell Aff., Ex. 2, Doc. #39).

The only other evidence on the circumstances of the entry into the home is from Officer Hughes. None of the parties have submitted any evidence originating from Officer Gallant. Hughes asserted in his affidavit that when A.C. answered the door, he said that his mom was not home and "they" were out running errands (Hughes Aff. ¶ 5, DSOF., Ex. D). The officers asked who "they" was, and A.C. became nervous. Id. Hughes asked if his father was back living in the house, and A.C. responded affirmatively. Id. ¶ 6. A.C. also said that he did not want to tell them that his father was living there because he knew his father would have to go to jail. Id. ¶ 7. A.C. said that his parents would be home soon. Id. ¶ 8. According to Hughes, he and Gallant "did enter the plaintiff's home with the permission of A.C, in an attempt to determine the whereabouts of plaintiff." Id. ¶ 9. There is no indication from the affidavit that the "permission" given by A.C. was anything other than implied. There is also no indication that the officers asked permission to enter the home.

Hughes' affidavit appears to rely on his narrative report given two days after the incident, as it follows it nearly word for word (Officer Hughes Narrative Report, DSOF., Ex. B-25). The statement are similar to those Officer Hughes testified about on May 14, 2004,

- 8 -

presumably at Plaintiff's criminal trial, except that at trial Officer Hughes said that A.C. began to cry after he asked if his parents were home (Pl.'s Decl. at 39-40, Ex. A. Doc. #39).

**B. Analysis**

**1. Implied Consent**

Absent exigency or consent, police may not conduct a search of a home without a warrant, Brigham City, Utah v. Stuart, 126 S. Ct. 1943, 1947 (2006); U.S. v. Reid, 226 F.3d 1020, 1025 (9th Cir. 2000), nor may police enter a home to make an arrest without a warrant, even if they have probable cause, Payton v. New York, 445 U.S. 573, 585-90 (1980). It is undisputed that in this case, there were no exigent circumstances, and Officers Hughes and Gallant did not have search warrant. Defendants also do not contend that they had an arrest warrant.[2] Instead, they contend that the entry did not violate the Fourth Amendment because Plaintiff's 11-year-old stepson gave implied consent. It is undisputed that (1) neither Officer Hughes nor Officer Gallant expressly requested permission to enter, and (2) A.C. did not give express consent to search.

Generally, the question is whether consent was voluntary, which is a question of fact to be determined from all the circumstances. Ohio v. Robinette, 519 U.S. 33, 40 (1996); Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). Consent may not be coerced, no matter how subtly. Schneckloth, 412 U.S. at 228. Whether the circumstances justified the officer's action is assessed objectively, regardless of the officer's subjective motivation. Brigham City, Utah v. Stuart, 126 S. Ct. 1943, 1948 (2006) (quotation omitted). Thus, if the officers reasonably believed that they were given consent by a third party, the entry is not unreasonable. Illinois v. Rodriguez, 497 U.S. 177, 186-88 (1990); Matlock, 415 U.S. at 171. In a criminal case, the government bears the burden of showing that consent was voluntary

---

[2]Despite Defendants' answer stating that Plaintiff was arrested on an outstanding warrant for the charge of aggravated assault (Doc. #12, ¶ 4), in response to interrogatories, Defendants denied that they were "armed with a search or arrest warrant"(PSOF Ex. 27 ¶ 15, Doc. #101). Also, Officer Hughes described their visit to the home that day as "follow-up." Id. Ex. 26 ¶ 30, Ex. 27 ¶13.

- 9 -

but in a § 1983 action, the plaintiff carries the ultimate burden on each element of his claim, including lack of consent. Pavao v. Pagay, 307 F.3d 915, 919 (9th Cir. 2002).

Defendants place much stake upon the argument that a minor has the capacity to give consent. Existing case law holds that a person's age is a factor to be considered in considering whether the consent is voluntary. See U.S. v. Gutierrez-Hermosillo, 142 F.3d 1225, 1230-31 (10th Cir. 1998); Lenz v. Winburn, 51 F.3d 1540, 1548-49 (11th Cir. 1995); United States v. Clutter, 914 F.2d 775, 778 (6th Cir. 1990). Regardless, A.C.'s tender years are not dispositive on the issue of consent.

Instead, the Court finds that the decision in U.S. v. Shaibu, 920 F.2d 1423 (9th Cir.), amended, 912 F.2d 1193 (1990) controls this case.[3] In Shaibu, the police were looking for one man at an apartment complex and pressed a buzzer at the entrance gate. A voice (Shaibu) asked who was there, and the police did not respond. The gate opened, and they entered. The police walked into a hallway, and Shaibu stepped out of his apartment, leaving his door open. An officer identified himself and asked if the man they were looking for was inside. Shaibu turned around and walked into his apartment, leaving the door open. The police followed. There, the police did not find the man they were looking for, but they found evidence that Shaibu committed bank fraud. The district court found that Shaibu had given an "implicit invitation" to enter and search his apartment when he walked in and left the door open. The Ninth Circuit reversed, holding that when police do not expressly request permission to search, consent may not be inferred.

In its opinion, the Ninth Circuit began with the concept that consent is not lightly to be inferred. Shaibu, 920 F.2d at 1426. Under some very limited circumstances a court will infer consent from the cooperative attitude of the defendant, but "this court has never sanctioned entry to the home based on inferred consent." Id. (citations omitted). It is "one thing to infer consent from actions responding to a police request, and "quite another to sanction the police walking in to a person's home without stopping at the door to ask permission." Id. at 1427. The court of appeals found:

---

[3] Neither party cited Shaibu.

- 10 -

> Although an open door may thus affect the range of permissible action for police possessing a warrant, there is no authority that an open door gives police legal grounds to enter the home without explicit request when they infer consent from mere acquiescence. United States v. Impink, 728 F.2d 1228, 1233 n.3 (9th Cir. 1984) (in implied consent cases, "the suspect himself takes some action" showing "unequivocal and specific" consent). We do not expect others to walk in to our homes, even if the door is open, without first requesting permission to enter. That the police would so enter, without request, creates an impression of authority to do so. In light of the standard in this Circuit, that "[c]oercion is implicit in situations where consent is obtained under color of the badge," United States v. Page, 302 F.2d 81, 84 (9th Cir. 1962), we interpret failure to object to the police officer's thrusting himself into Shaibu's apartment as more likely suggesting submission to authority than implied or voluntary consent. Such submission is not effective consent.
>
> Even if there was not implicit coercion in fact here, the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. This will not do. . . . . We hold that in absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent.

Shaibu, 920 F.2d at 1427 (some citations and quotations omitted).

The primary difference between this action and Shaibu is that the alleged consent in Shaibu originated from the putative defendant and in this case, from A.C., a third party. Defendant cites an earlier decision, U.S. v. Impink, 728 F.2d 1228 (9th Cir. 1984), which addressed implied consent by a third party. In Impink, the issue was whether a landlady implicitly consented to search of the leased property. The parties conceded that she was never explicitly asked to consent to a search and did not volunteer consent. The Ninth Circuit rejected the contention that the landlady, by calling police and cooperating with the investigation, had impliedly consented to the search. The Court of Appeals noted that "we are asked to infer consent from the actions of a third party – a most uncommon situation." Id. at 1233 n.3. The court, however, focused on the lack of the capacity of the landlady to consent because she lacked joint access to the premises with the lessee, and that the lessee was present and actively opposed the search. Id. at 1233 (distinguishing U.S. v. Matlock, 415 U.S. 164 (1974)). In contrast, Plaintiff's stepson A.C. had some capacity to consent based upon sharing the home with Plaintiff, and Plaintiff was not present to oppose the search. Thus, the Impink decision does not control this action and regardless, by its result

- 11 -

1 lends credence to the idea that consent may not be impliedly given when there is no express
2 request.

3 The Court finds the result in this case is dictated by Shaibu's clear and express
4 holding that "We will not infer both the request and the consent." Shaibu, 920 F.2d at 1428.
5 There is no evidence to show that either Officer Hughes or Gallant expressly requested
6 permission to enter Plaintiff's residence. Officer Hughes has not testified that he or Officer
7 Gallant made a request, and there is no testimony from Officer Gallant to contradict him.
8 The only clear testimony is from A.C., who clearly testified that the police did not ask to
9 come in. His testimony is corroborated by his mother, whose affidavit indicates that A.C.
10 told her later that the police did not request to search. Thus, the record leaves no dispute that
11 the officers did not make an express request to enter or search the home.

12 It is also undisputed that A.C. did not give express consent to enter. Defendants'
13 contention that he implicitly consented is not persuasive in light of Shaibo's holding that
14 consent cannot be inferred when there is no express request to search. Consequently, the
15 entry into Plaintiff's home violated the Fourth Amendment.

16 **2. Qualified Immunity for Defendants Hughes and Gallants**

17 Defendants assert the defense of qualified immunity. Qualified immunity is "an
18 entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472
19 U.S. 511, 526 (1985). A two-step evaluation of qualified immunity requires both a
20 constitutional inquiry and an immunity inquiry. The "constitutional inquiry" asks whether,
21 when taken in the light most favorable to the non-moving party, the facts alleged show the
22 official's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).
23 This question is answered affirmatively because the Court has found that on the undisputed
24 facts of this record, Plaintiff's Fourth Amendment rights were violated.

25 When the first question is satisfied, the court turns to the "qualified immunity inquiry"
26 and asks whether the officer could have reasonably but mistakenly believed that his conduct
27 did not violate a clearly established constitutional right. Saucier, 533 U.S. at 201-05.
28 Defendants contend that for the Court to permit suit against them, the Court must find that

- 12 -

1  the law gives the officers notice that implied consent by a minor is not valid. As stated in the
2  foregoing, whether a minor can give implied consent is not the question under these
3  circumstances. Rather, the question is whether implied consent is effective when there is
4  no express request to search a home. Defendants have not addressed qualified immunity
5  under those terms. In any case, the Ninth Circuit held in Shaibu, a decision that issued 13
6  years before the facts of this case, that a search is unreasonable if based on implied consent
7  when there is no express request to search. The right was clearly established, and the officers
8  could not have reasonably believed that they had authority to enter without an arrest or
9  search warrant. Accordingly, the qualified immunity defense fails.

10       **3. Liability of the City**

11       The City cannot be held liable for the unconstitutional search unless its policy or
12 custom caused the constitutional injury. See Leatherman v. Tarrant County Narcotics
13 Intelligence and Coordination Unit, 507 U.S. 163, 166 (1993); Monell v. Department of
14 Social Services, 436 U.S. 658, 694 (1978). In other words, a § 1983 claim against the City
15 "cannot succeed as a matter of law" unless Plaintiff contends that the City maintains a policy
16 or custom pertinent to his injury, and explains how such policy or custom caused his injury.
17 Sadoski v. Mosley, 435 F.3d 1076, 1080 (9th Cir.), cert. denied, 126 S. Ct. 2864 (2006).

18       In his motion, Plaintiff contends that the City fails to train and discipline its officers.
19 He claims that the City turns a "blind eye," that 13 officers have been accused of misconduct,
20 that Officer Hughes has not been properly disciplined, and that an in-depth management
21 study of the police department revealed that it was not properly functioning. However, in
22 his Amended Reply & Response, Plaintiff sets forth various contentions regarding how
23 Officers Hughes and Gallant *violated* police department policy regarding searches (Am.
24 Reply & Resp. at 13-15, Doc. #100). Specifically, Plaintiff contends that the officers
25 violated departmental policy stating that: (1) persons may not be aware of their right to refuse
26 permission to search, (2) warrants must be obtained if the defendant or anyone in standing
27 objects, (3) consent searches are limited to the areas for which consent is given, (4) consents
28 must be in writing, and (5) protective sweeps occur near the arrestee. Plaintiff asserts that

1  the policy is "clear" and that Defendants "abused discretion by not following policy or being
2  sure of their actions . . . . " Id.

3  The actions of individuals may support liability only if the employees were acting
4  pursuant to an official policy or custom of the municipality. Botello v. Gammick, 413 F.3d
5  971, 978-79 (9th Cir. 2005), cert. denied, 126 S. Ct. 1419 (2006); Cortez v. County of Los
6  Angeles, 294 F.3d 1186, 1188 (9th Cir. 2001). In light of Plaintiff's contention that Officers
7  Hughes and Gallant failed to follow established policies of the police department that would
8  have prevented the unconstitutional search, it is unclear how a policy or custom of the City
9  of El Mirage caused them to violated Plaintiff's constitutional rights. Even if, as Plaintiff
10 contends, the City has a policy or custom of permitting abuses by police officers or
11 mismanaging its police department, Plaintiff has not explained how that policy or custom
12 caused the unconstitutional search by Officers Hughes and Gallant. The Court will therefore
13 grant summary judgment in favor of the City of El Mirage on the search claim.

14 **4. Damages**

15 **a. Availability of punitive damages**

16 Plaintiff has requested an award of exemplary damages of $500,000 against each
17 Defendant. A jury may award punitive damages under § 1983 either when a defendant's
18 conduct is driven by evil motive or intent, or when it involved a reckless or callous
19 indifference to the constitutional rights of others. Dang v. Cross, 422 F.3d 800, 807 (9th Cir.
20 2005) (quotation omitted). Defendants contend that punitive damages are not proper because
21 their conduct was not oppressive, malicious, or in reckless disregard of Plaintiff's rights. The
22 Court finds that for the question of the unreasonable search, there are sufficient facts from
23 which a reasonable jury could infer that the punitive damages standard was met. Defendants'
24 cross-motion on this point will be denied.

25 **b. Compensatory damages**

26 Plaintiff has requested compensatory damages of $250,000 against each Defendant.
27 The abstract value of the violated constitutional right may not form the basis for an award
28 of compensatory damages. Memphis Community School Dist. v. Stachura, 477 U.S. 299,

- 14 -

1 308 (1986) (citing Carey v. Piphus, 435 U.S. 247, 264 (1978). Plaintiff must prove that the
2 unlawful entry caused him "actual, compensable injury." Heck v. Humphrey, 512 U.S. 477,
3 487 n.7 (1994); Trimble v. City of Santa Rosa, 49 F.3d 583, 585 (9th Cir. 1995) (*per*
4 *curiam*). The Ninth Circuit has held that the § 1983 victim is "entitled to recover
5 compensatory damages for all injuries suffered as a consequence of those deprivations"
6 according to general tort principles applicable to the type of deprivation proved. Borunda
7 v. Richmond, 885 F.2d 1384, 1389 (9th Cir. 1989). This may include "compensation for
8 economic harm, pain and suffering, and mental and emotional distress that results from the
9 violations." Id. at 1389; see also Hector v. Watt, 235 F.3d 154, 157 (3d Cir. 2000) (because
10 liability must be assessed in terms of the risks that are constitutionally relevant, victims of
11 an unreasonable search may recover damages directly related to the invasion of their privacy,
12 including physical injury, property damage, injury to reputation, etc.).

13 Possibly, the question of compensatory injury could depend in part on the scope of
14 the search of the home. The parties dispute whether Defendants conducted a cursory
15 protective sweep or a more extensive invasion into areas like the master bedroom, filing
16 cabinets, and electronically-stored information on Plaintiff's phone. In the Court's opinion,
17 because the entry was unlawful, any ensuing search would also violate the Fourth
18 Amendment, no matter its breadth. For this reason, the parties' dispute regarding the extent
19 of A.C.'s authority to permit a search of areas such as the master bedroom is now immaterial
20 to the question of the Fourth Amendment violation, but the extent of the search may bear
21 some relevance to the question of damages. As stated, Plaintiff must be able to prove
22 "actual, compensable injury" to recover compensatory damages.

23 **5. Conclusion**

24 In sum, the Court finds that Plaintiff is entitled to summary judgment for his claim that
25 Officers Hughes and Gallant unlawfully entered his home because Defendants have
26 essentially conceded that the police officers did not make a request to enter and, as a matter
27 of law under Ninth Circuit precedent, consent cannot be inferred from the circumstances.
28 The City of El Mirage is entitled to summary judgment in its favor because there is no

- 15 -

evidence to show how a policy or custom of the City caused the unconstitutional search. The remaining issue for the jury is whether to award any compensatory or punitive damages.

## V. Arrest

### A. Legal Standard

Defendants cross-moved for summary judgment, contending that the force used in Plaintiff's arrest was not excessive. A Fourth Amendment claim of excessive force is analyzed under the reasonable standard set forth by the Supreme Court in Graham v. Connor, 490 U.S. 386 (1989). The analysis is objective: whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them. Id. at 397. The Court must balance the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. Id. at 396.

The relevant factors include: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. Graham, 490 U.S. at 396. These factors are not exclusive, because the Fourth Amendment's reasonableness test is not "capable of precise definition or mechanical application." Id. The factors bear on the reasonableness of a particular application of force used to effect a particular seizure. Smith v. City of Hemet, 394 F.3d 669, 702 (9th Cir. 2005), cert denied, 125 S. Ct. 2938 (2005). Thus, the first step is to consider the quantum of force used. Id.

### B. Analysis

Defendants are not entitled to summary judgment if the evidence, viewed in a light most favorable to Plaintiff, could support a finding of excessive force. Smith, 394 F.3d at 702. Even when solely considering Plaintiff's testimony regarding the events, a reasonable jury could not find that the force used was excessive.

It is undisputed that while at Plaintiff's home, A.C. called Plaintiff on his cell phone and learned that he was on his way home with Jodie. The officers then called for back-up, which was Officers Tevault and Chambers, the other Defendants in this action.

    At Plaintiff's deposition on December 19, 2005, he testified that he and Jodie had turned onto the street of their home when a marked and an unmarked car pulled up behind them, without lights on (William Mark Isbell Dep. at 57, Sept. 19, 2005, Ex. A, Doc. #84). His wife suggested that he drive to the end of the park and "deal with this then." Id. Plaintiff's house was about four to six houses down the street, and as soon they drove past, the police turned the lights on. Id. at 57-58. Plaintiff pulled over. Then four or five more marked units "came into play." Id. at 58. The officers boxed in Plaintiff's car. Officer Chamber's vehicle was facing the front, Tevault's was facing the driver's side, and Hughes was parked behind. Gallant's car was behind Hughes' car. Id.

    Tevault and Chambers jumped out with weapons pointed at Plaintiff's head. (Pl.'s Dep. at 58). Tevault began screaming, "Move and I will kill you. Move and I will kill you." Id. Chambers said the same thing. Id. at 59. Plaintiff kept saying, "I'm doing what you said. Please don't shoot me." Id. Jodie Isbell's car door was opened, and Officer Hughes "ripped" her out by the arm and threw her to the ground. Id. at 58-59, 62. Plaintiff repeatedly asked why she was being treated that way. Id. at 59.

    Plaintiff had been told to take the keys out of the car and put them on the hood, and he complied. Id. at 59-60. He then put his hands in the air continually so he would not be shot. Id. at 60. While his hands were in the air, either Tevault or Chambers brought a dog to the car. Id. The dog continually barked and nipped at Plaintiff. Id. at 60-61. (Plaintiff does not state that the dog actually bit him or harmed him in any way.) Tevault grabbed Plaintiff and threw him to the ground as he put handcuffs on him. Id. at 60. They told him that he was being detained and took him to the police station. Id. at 60-61.

    Based on Plaintiff's testimony, the use of force was holding him at gunpoint under a threat of death if he made inappropriate movements and handcuffing him while on the ground. First, Plaintiff was a suspected felon. The government has "an undeniable legitimate interest in apprehending criminal suspects," and that interest is even stronger when the criminal is suspected of a felony. Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003).

Second, Plaintiff had a known history of violence, and police believed he was "at large" for a felony so that a "high-risk" stop was necessary. Plaintiff has not controverted that assertion, and the method of the arrest certainly demonstrates that the officers believed him to be a high risk. Moreover, Plaintiff admits that the police were "under the impression" that he is a gang member and a drug dealer (Pl.'s Dep. at 69). He claims the impression is false, but he admits that in 1999 in the Arizona Department of Corrections, he was validated as a member of the Aryan Brotherhood prison gang. Id. at 69-70. He also has tattoos associated with the gang, including swastikas. Id. at 71-72. He has the letters SWP tattooed on his stomach, but denies that "WP" means White Pride; he just "liked those three letters." Id. at 73. Under these circumstances, it was not excessive to point a gun at Plaintiff to ensure that he did not endanger the officers' lives. Compare Robinson v. Solano County, 278 F.3d 1007, 1014 (9th Cir. 2002) (where no dangerous exigent circumstances are apparent at the time of detention and officers outnumbered the plaintiff, it was unreasonable to point a gun at an unarmed misdemeanor suspect who was approaching the officers peacefully and who was not charged with any crime).

Third, it was not an excessive use of force to put Plaintiff on the ground to handcuff him, particularly considering that Plaintiff does not claim that he suffered any physical harm during the arrest and handcuffing. "Not every push or shove, even if may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (internal quotation and citation omitted). Viewing the evidence in the light most favorable to Plaintiff, no reasonable juror could infer that the use of force to arrest Plaintiff was excessive. The Court will grant Defendants' summary judgment motion on this issue.

**VI. Retaliation**

Plaintiff makes some references to a retaliation claim. This claim, brought as Count III, was dismissed on screening (Doc. #14). Plaintiff may not raise it again.

**VII. Motions Seeking Injunctive Relief**

    **A. Motion for Typewriter**

Plaintiff requests an order requiring the Arizona Department of Corrections to provide him with a typewriter for this action and two other actions he has pending in state court (Doc. #53). He is housed in Special Management Unit II at one of the highest custody levels, a placement that is commonly known to house inmates who can fabricate weapons from common every day objects. Plaintiff asserts that his hands sometimes shake from hypertension and borderline diabetes, which sometimes causes him to take days to draft pleadings. Plaintiff's motion, however, is unsupported by any medical evidence that he cannot write, and this action contains numerous legible pleadings filed by Plaintiff. In addition, Plaintiff's request for a typewriter for his state court proceedings are properly presented to the state court, not this Court. The motion will be denied.

    **B. Motion to Review Deposition**

Plaintiff requested injunctive relief to preclude Defendants from using his deposition transcript because he had not had an opportunity to review it and make changes under Rule 30(e) of the Federal Rules of Civil Procedure (Doc. #70). Defendants responded that Plaintiff's motion may be denied as moot because he has since been provided with the opportunity to review his deposition (Doc. #71). Later proceedings bear this assertion to be true (Doc. ##89, 92). The motion will therefore be denied as moot.

**IT IS ORDERED:**

1. Plaintiff's Motion for Typewriter (Doc. #53) is **denied**.

2. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction Hearing (Doc. #70) is **denied** as moot.

3. Plaintiff's Motion for Partial Summary Judgment (Doc. #39) is **granted in part** on Plaintiff's claim that Officers Hughes and Gallant violated his Fourth Amendment right by entering his home on December 12, 2003. The motion is **denied in part** as to the City of El Mirage.

4. Defendants' Cross-Motion for Summary Judgment (Doc. #83) is **granted in part and denied in part**. Plaintiff's claim of excessive force in arrest is **dismissed**, but Defendants' contention that punitive damages are not available is **denied**.

5. Defendants City of El Mirage, Officers Tevault and Chambers are **dismissed**.

6. The remaining claim for trial is a question of damages against Officers Hughes and Gallant.

DATED this 3rd day of August, 2006.

*James A. Teilborg*
United States District Judge